Thank you, Your Honors. My name is Nicholas Hentoff, and I represent Recreational This case has been consolidated with the case, the appeal of John Van Brunschot and Ruth Van Brunschot. And although I don't represent them, they apparently have sent a letter to the court's clerk's office, ceding me their time, so I'll take 20 minutes with the Court's permission. I'd like to say that it's good to be back arguing before Judge Fletcher and Judge Toshima. And although I lived in Philadelphia for two years and worked there, I never had the pleasure to have the opportunity to do so now. Before I get to the issues, I just wanted to take a moment to introduce my clients, or at least one of my clients, Milo and Nancy Fentzel, who are sitting in the front row behind my table, and they have flown up here from Phoenix, Arizona, and it's important for them that the Court understand what an impact the statute in question has had on their lives since it was passed in 1999 and since 1997, and since the district court made its rulings. And since the lawsuit was filed in this case, Mr. Fentzel has been prosecuted twice. He has been arrested once by a SWAT team and spent time in jail. His second trial is scheduled to begin next week. A petition to revoke his probation was filed earlier this month, and he faces a maximum of six months in jail and the loss of his chiropractic license. I'm sorry, what is he, a club owner? Yes, Your Honor. He is a managing member of Recreational Developments of Phoenix, which is a limited liability company. And just for clarification purposes, the original – it was originally filed under Recreational Developments of Arizona by the original trial attorney, and Recreational Developments of Arizona is the managing member of Recreational Developments of Phoenix and they are managing members of Recreational Developments of Arizona and of Phoenix. However, Mr. Fentzel is born the brunt of the enforcement action. John Van Brunschot and Ruth Van Brunschot. Ruth Van Brunschot was convicted once. Ruth Van Brunschot last month just had a petition to revoke her probation. She's facing a minimum of 30 days in jail. And John Van Brunschot was just served with a summons under the statute, under the ordinance just last week. This case also has extremely wide-ranging implications for a wide variety of civil nations throughout the Ninth Circuit. Ultimately, what you're asked to decide here is whether the exacting scrutiny that the Dorbert and Kumotair cases apply to scientific experts are going to be applied to all experts, whether they're going to be applied to lay experts, and whether they're going to be applied to otherwise knowledgeable experts with specialized knowledge. I think it's absolutely clear, let me just say at the outset, that Hanke controls this case. This case is a published opinion. Judge Silver has published her earlier opinion. She's published her last order striking the affidavits. And if this Court affirms that opinion, I believe very strongly that it will create a conflict in the circuit between this case and Hanke, because I think it's absolutely clear that Hanke controls. This case will have the most wide-ranging impact, however, on civil rights litigants and criminal defendants who routinely rely on such experts, experts who are otherwise knowledgeable, experts with specialized knowledge and with lay experts. And it's typically these plaintiffs and in criminal cases these defendants who are discrete, anonymous subcultures. They tend to be minority groups where there is little scientific acknowledgment, little scientific study. And every case that you look at that has been decided since Dorbert and Kumotair in the Ninth Circuit, the Taylor case, the Mendoza-Payas case, all of these cases, if you adopted Judge Silver's standard with respect to the admission of expert testimony, I think would have been a different result. Well, wasn't she really challenging what they were going to testify to as being irrelevant to the case rather than the fact that they might be experts on many subjects? And on many scientific studies involving sex. Your Honor, I don't think it was a relevance determination. If you look at the district court's concerns, you'll find that in the case of Scherzer Mr. Scherzer, Dr. Scherzer and Mr. Gould, that the objections that she raised for Dr. for Mr. for Dr. Scherzer were the same that she raised for Mr. Gould. And basically, number one, it was that he lacked credentials to apply as to the specific subjects addressed in the report, that he had not identified the nature or location of his doctoral training. He had not identified relevant discipline that provides his basis for knowledge. She was concerned that Dr. Scherzer's methodology was not reliable, and here we're going directly to the Daubert requirements that are applied to the scientific experts. That does the record show what Dr. Scherzer's doctoral field is? No, it doesn't. But I think that this Court should look to the Seventh Circuit's case, the Seventh Circuit case of turf-racing products, where Judge Posner addressed that specifically, and he said the notion that Daubert requires particular credentials for an expert witness is radically unsound. He doesn't equivocate. The Federal rules of evidence do not require that expert witnesses be academics or Ph.D.s or that their testimony be scientific, natural scientific or social scientific in character. And this was issued in 2000, which is post-Daubert. It's post-Cumotire. And, you know, I think that Judge Posner ---- I'm not sure that it's quite half-way like those. Judge Posner isn't to be understood as saying anybody who wanders in and says, please call me doctor, and I'm therefore to get up on the witness stand. No. And the Ginro Amn case is the case that was principally relied on by the district court in this case. And I think that there's a hypothetical that I can offer to the Court, which will show how this case, this particular circumstance that we face here with Dr. Scherzer and Mr. Gould, how that differs from the situation in Ginro Amn. Ginro Amn was the case that was cited by the district court here where they had a man who was going to testify in Korean business practices, and apparently it was his hobby to follow Korean business practices, and he was married to a Korean woman. And the Court said that those obviously don't qualify you to be an expert on Korean business practices. However, I mean, I just moved into a new house, and I happened to notice when I moved into the new house that there is a fire ant colony that has taken up residence in a crack in the pavement right outside the house, and they troop across my patio every day back and forth to a fruit tree where they take items to bring back to nourish their home. And I enjoy watching the fire ants, and I consider it to be a hobby of mine now to watch the fire ants. I've also watched the Discovery Channel, and I've watched shows on fire ants, and I may have read an article in Nature magazine on fire ants. And that doesn't necessarily mean that I'll obviously qualify as an expert on the behavior or destructive ability of fire ants. However, let's say after my clerkship, after law school and after my clerkship, I decided to give up the law, and I decided to open up Hentoff's Fire Ant Farm on I-10 right outside of Tucson. And I put up billboards, and over the years, I lectured to school children and to universities about fire ants, that I was somebody who was consulted routinely by fire departments throughout the State of Arizona, and for 20 years I ran Hentoff's Fire Ant Farm. The fact that I did not have a Ph.D. in entomology, the fact that I have not done specific scientific studies on fire ants wouldn't mean that I wouldn't be qualified as an expert under Daubert, under Kumotaira, under Hankey. I mean, the case that I can point to that's the case. Yes, sir. I'm a trial judge, so I look at these things more parochially than a colleague. But from time to time, I have to address Daubert issues in my court. If you, sir, came in on the basis of the credentials you've described, and you were presented as an expert on fire ants, and you were presented by a counselor, Dr. Hentoff, I guess I would, I would sort of expect that I would hear sooner or later what you were a doctor of. Now, you were a reciter, but you didn't recite it, so I thought, and you didn't purport to be a doctor. But the post-doctorate in this case was so characterized in the book that it was going to be presented to the jury as Dr. Scherzer. In his work, in his work. We don't know his discipline. Is that somewhat of a result? Well, we do know his discipline, because it was described in detail in his report. You know, we have Dr. Norman Scherzer, who's a professor at Essex County College in Newark, New Jersey, for the past 26 years, teaching anatomy and physiology and pathophysiology. He's a visiting professor at Rutgers University for the 14 years, teaching human sexuality, visiting professor at NYU for 10 years, teaching a graduate course in sexual function and reproduction. He's an AIDS educator since 1982, lecturing on medical aspects of AIDS, co-edited a descriptive dictionary and atlas of human sexuality, and a complete dictionary of sexology. He mentions in his report. But we don't know what his Ph.D. is, or whether he has a Ph.D. No. And I think to a certain extent it's form over substance, because what we're talking about here is not scientific evidence. What we're talking about here, this is a – what he testified to was essentially three things. He testified to the awareness of sexually transmitted diseases by members of this subculture that we call swingers. He also testified as to the practices of safe sex among this subculture, which is based on his personal knowledge. And he describes his personal knowledge in terms of his years of teaching sexuality and his years of interviewing and talking to club members and to club owners. And then he also talked about the, you know, the transmission – actual transmission rates. And if the – if the district court had a problem with Dr. Norman Scherzer talking about actual transmission rates with respect to the scientific standard, then she could have struck that portion of his testimony. But she did not need to, nor was she authorized to strike his testimony regarding the awareness of STDs among swingers and the practice of safe sex. You know, I'll tell you that if I had this case, if I were the trial judge, I'm a trial lawyer, and if I had this trial case, I might have gone to hire an infectious disease specialist at Albert Einstein Montefiore Hospital in New York, and it's a medical school. You know, but I wasn't the trial attorney in this case. He hired Dr. Norman Scherzer. And I'll tell you, a lot of the criticisms that you have with respect to what his credentials are, I think you can infer from the fact that he's a professor at Essex County, that he's a visiting professor at Rutgers and at NYU, both of which are prestigious universities. The fact that he's a visiting professor there, you can – and he says his postdoctoral studies. So the fact that you don't know where his postdoctoral studies were or what his specific I mean, clearly, Mr. Hayes, if this Court remands this case and it goes to trial solely on the basis of Dr. Norman's records say about his, quote, postdoctoral studies. Well, what it does is – and the – in my excerpt of record, his report is at TAV-6, and it's a seven-page single-space report. And basically, what it – he mentions my postdoctoral training was primarily through AASECT, American Association of Sex Educators, Counselors, and Therapists. But the point that I was trying to make is that Mr. Hayes is going to have a field day with this guy on cross-examination, and that's exactly what the trial process is supposed to be. It's supposed to be an adversarial process where you test the weight of the evidence through cross-examination. It's not supposed to be a situation where the trial judge converts Gatekeeper into FactFinder and precludes the testimony wholesale. Well, didn't Judge Silver also find that, you know, the methodology used in the report, if there was any, wasn't shown to be reliable? Well, that's the main point that I want to make, is that if you look at Hanke, Hanke is very clear on this subject, and Hanke addresses this issue very explicitly. It says, quote, "...Daubert factors, peer review, publication, potential error rates simply are not applicable to this kind of testimony." What kind of testimony was involved in Hanke? I'm sorry? What kind of testimony was involved in Hanke? Hanke involved the testimony of a police officer who testified about gangs. This reports to be a scientific report by a Ph.D. It's entirely a different kind of report, isn't it? Well. And was involved in Hanke? What the point that I was trying to make to Judge Pollack is the fact that this report, just because somebody puts a doctor in front of their name doesn't mean that they can't also testify on the basis of other knowledge and specialized knowledge. In other words, if she had a problem with this, I'm sorry, Judge. If the methodology used is shown to be reliable. Well, I mean, the methodology for what? In other words, the point that I was trying to make is that. For the conclusions. Well, I know, but we have three conclusions. One conclusion that he drew was the awareness of STDs, all right, among the slinging community and the practice of safe sex among the slinging community. The only thing that really approaches any kind of a scientific testimony on his part is the actual, you know, actual transmission of HIV. These are three distinct things that he's testifying to. And my point is, is that if she had concerns, and I don't think her concerns were valid, about his testimony on the question of transmission of HIV, those concerns that she could have excised that portion of his testimony and left the other testimony intact. Can I turn your attention to something different? On appeal before us is not just the admission of these evidentiary issues, but whether, in fact, this is protected expressive conduct, is that not before us also? Yes, Your Honor. What we did and what we did is what we decided to do is we felt that our best appeal was to appeal directly on the issues of the striking of the expert affidavits and the striking of the expert reports and the affidavits of the appellants. And I personally felt that with the amendment of the statute that occurred in 2001 that the overbreath and the vagueness claims weren't worth appealing with respect to the question of whether there's an issue of material fact on the privacy issues, on the expressive conduct issues, on the association issues. Yes, we did raise that. It wasn't briefed thoroughly within this brief because it would have resulted in a 60-page brief. But isn't that kind of foundation to what we're talking about here? Well, what it is is a question of what remedy this Court has in overturning Judge Silver's opinion. Do you simply mean to have her consider the affidavits of the plaintiff, of the appellants and the reports of the experts, or do you really make a finding based on the record that's before you that there is an issue of material fact once you determine that these affidavits and reports are properly considered? I think clearly, although we ask for a remand for the Court to consider the reports in the affidavits, that you do have it in your power to make a finding that there are issues of material fact. And all that you see, Your Honors, is that. You don't really argue that in your brief. No, it's mentioned, though, Your Honor. And all I can say is that this case has cost our clients tens of thousands of dollars over the course of the many years that this has been going. And it's just a question of resources, and it's a question of whether we were going to submit a 32-page brief or a 60-page brief. And I still feel that what will happen is if this Court overturns the district court's opinion and remands it back, what we are going to do, because there are a lot of other issues that are not in the record, that need to be addressed. I mean, the previous trial counsel never moved to amend the complaint to argue the issue of enforcement. I mean, this case has been vigorously enforced with a single-mindedness that would make inspectors very jealous. And we need to go back. In fact, next week we're going to be filing a new lawsuit that just talks about the enforcement action and the equal protection issues relating to enforcement, which were not addressed. And if you remand this case and we consolidate it, then we'll have a single trial on the subject. Kennedy. If we don't agree with you on the evidentiary issues, are you saying that there are issues that are independently before us? Yes, absolutely, Your Honor. This Court has everything that it needs to make a finding that there are material issues of disputed fact in this case were the reports to be considered by the trial judge. Initially, as I said in the pleadings, I asked that you simply remand it to the district court. I'll leave it up to the court's discretion what remedy they want to fashion. But clearly, what we asked for in our pleadings was that it remand to the district court for them to consider the reports. Can you be precise as to which issues are before us? Yes. The issues that are currently before you are the issues that were decided in the district court's last opinion, which are the claim for expressive association, the claim for expressive expression, and the claim for privacy. Now, is the record adequate for us to review those and do that? Yes, I believe that's sort of a two-pronged answer to your question. I would like the record to be better, but I think that the record is adequate for you to determine that. I think that there is an issue of material fact. Obviously, if this is remanded to the district court simply with instructions to review the reports and make a determination, the reports and affidavits, you know, before this – before the time for filing a petition for cert is up, I will be – I will be filing a motion for the judge to reopen, you know, discovery or I'll probably wait until the time is run, but I'll – I'll be filing a motion to reopen discovery and to address some additional issues. You've got about less than a minute left. Do you want to reserve for the bubble? Absolutely, Your Honor. I knew I'd get carried away. Good morning, Your Honor. May it please the Court. My name is James Hayes. I'm an assistant city attorney with the City of Phoenix, and I don't normally sound like this. I apologize, but I've been struggling with something in the air down there in Phoenix for the last week. I think I'll do the best I can. I think I'll hold out. What I really, really want to do, because there are really only two people in this room, obviously – I'm sorry, only one person in this room, two people involved today that have been with this case since the very beginning, and that's Judge Silver and myself. And I really want you to have an understanding of exactly what's at issue now in the context in which Judge Silver saw those issues when she made this ruling back in August of last year. Before I do that, it's very important I address some of the things that Mr. Hentoff just said so that you're not misled. First of all, we're not in trial court, so whether or not his client is being prosecuted or arrested or anything of the sort is really not relevant to any issue before the Court today. I will concede the city is enforcing this ordinance as it should. No court has ever enjoined the enforcement of this ordinance, and so we will continue to enforce it to the extent we can until some court, I don't think that's going to happen, tells us we can't. If you look at the record, you'll see that it's very, very difficult to find in the previous counsel's work any explicit statement of which facts are at issue. In other words, Mr. Kalp did not do a very good job for his clients in explaining to the Court exactly what it is factually that's disputed in this case. And I'm going to go through each of the four issues, there are really four, not three as Mr. Hentoff said, and explain to you the posture in which those four issues currently are, and it will help you resolve this expert witness question. Before you get there, what about sort of the closing portion of Mr. Hentoff's argument that he's also raising, you know, issues under this expressive conduct, right of privacy, and disputed issues on summary judgment? You don't seem to address any of those in your brief. Justice Kagan, the reason I didn't address those is because they're not briefed. Those – and I'd like to go through each of those issues if I could, and that'll respond in a more specific way to your question. I think you'll understand why I gave the answer I just gave. Well, you think those issues are before us? I beg your pardon? You think those issues are before the Court? No, Your Honor, I don't. What's before the Court, I think notice is important here, is what counsel noticed to the city was going to be argued before the Ninth Circuit. He presented three issues, which boiled down to really one issue, whether or not Judge Silver improperly excluded the testimony of Dr. Scherzer and Mr. Gold. As far as I can tell, that's the only issue before you, and that's the only issue I'm going to address. Now, the four issues below are impacted in varying degrees by this expert witness testimony, and that's what I want to focus you in on. Well, before you get there, these issues were raised in the brief, were they not, by the appellants, that this violated privacy, that it violated expressive conduct? Judge Fletcher, if they were mentioned, they were mentioned in passing. They weren't identified as an issue. Those issues have already been addressed by a separate, I believe, Ninth Circuit panel. We had four issues, which I think 10 or 11 were originally raised. We have four issues left. Let me just go through them quickly so we're all working from the same starting point. We have freedom of expression, freedom for expressive association. That's the Boy Scouts of America v. Dale issue. We have the right of privacy, as which I think the expert witness testimony is completely irrelevant. And then the final issue is an unconstitutional regulatory taking. There are two prongs to that. One prong was dismissed. The remaining prong is whether or not the city has a legitimate governmental interest in the ordinance. Those are the only four issues left in this case. And as counsel just said, apparently for reasons of economy, they focused in, and this was a strategic decision they made, they decided to focus in on Judge Silver's The court recognizes Judge Silver was simply applying Ninth Circuit law as it exists, and I will go through some of that with you. But I think it's very important at this stage to ask me only to address the issue which was raised in counsel's brief. If you would like, I will certainly answer any question you ask me relating to any issue in this case. But I only believe at this point it's fair to ask me questions in connection with the expert witness testimony, because that's all I was noticed would be at issue here today. But as I say, I'm happy to answer any question that any of the panel might have in connection with this case. All right. At least we have your understanding of, you know, what's involved on this appeal, right? Go ahead. Okay. Thank you, Your Honor. Let's start with the first issue, freedom of expression. The city's argument was that, and this will address some of your questions, I think, automatically. The city's argument in brief was that a business does not have the right, a First Amendment right, to offer live sex acts as entertainment. No court in the country that we could find, and that includes the plaintiffs, the city and the trial court, could find any decision that held the reverse, that in fact the First Amendment to the U.S. Constitution guarantees the right to offer a live sex act for entertainment. I'm leaving aside the issue of theatrical performance, although I'm not aware of any case that even allows it in that context. But that's not before us today, because that's not what these plaintiffs do. We have to deal with the facts as we found them. So the what Judge Silver did in this issue is asked herself whether or not the expert witness testimony, which was offered to make two points, I'm going to simplify it slightly, two points. Those two points are that they're making, is that swingers have a lower incidence of STDs than non-swingers. Let's leave aside for the moment how we define swingers and whether or not these plaintiffs, even operate clubs, exclusively open to swingers. So that's one thing they were trying to show. The second thing they're trying to show is that swingers, again, the same problem, who are they? But swingers have a core set of values and beliefs. And those are some, that's a set of beliefs that other swingers recognize. So Judge Silver, in this context, is trying to determine whether or not Scherzer and Gould has something relevant to offer on that issue. No matter what they say, this was the city's view, it doesn't help plaintiffs with that argument, because this type of conduct is not protected by the First Amendment, never has been, probably never will be. So no matter what Gould and Scherzer had to say on this issue, they're not going to be able to get over the constitutional hurdle of the fact that the conduct they're offering is not protected by the First Amendment. The second issue, which is tied closely to the first, is that these clients claim, sorry, Mr. Hanna's clients claim that they have a right to expressive association, similar to what the Boy Scouts have. They have a right to offer this type of conduct, because they are, again, they have this common set of beliefs. Okay.  So the whole issue had been resolved, as I say earlier on the motion to dismiss, is that the only thing different between the record then and the record now is that Boy Scouts of America v. Dale was decided by the Supreme Court, and that's why Judge Silver, in her opinion, goes through that case and adopts what the city's argument was, which is in order to have a BSA v. Dale argument, you must have protected expression as a predicate, and that was our first issue. So without that as a predicate, we don't have this freedom of expressive association. That is not before the Court today, with all due respect, as far as the city is concerned. So, again, Judge Silver, looking at that issue and the offer of Gould and Scherzer, asks herself, do they have anything relevant to offer here, and in that context goes through their qualifications, which I'll get to in a moment. That was the second issue. The third issue is the simplest of all, and that is the right of privacy. Their claim is that they have a right to offer these live sex acts in a semi-public place, and that's protected by the U.S. Constitution, the right of privacy. And they cite some of the regular privacy decisions. I'll leave out the most recent one, but that does Florence v. Texas, but that doesn't change the matter. I'd be happy to address that case if you'd like. But the problem is they just don't have the constitutional underpinning for that argument. And so no matter what Gould and Scherzer say, they're still stuck with the fact that they don't have a right of privacy that protects the operation of a live sex act business offering live sex acts as entertainment. So we're struggling here to find something to attach this expert witness testimony to, which is very important, as I say, because Kumo and other cases have recognized that context is important. These decisions are not rendered in a vacuum. The fourth issue is the right against regulatory takings without compensation, claiming that the city does not have a legitimate interest. Now, here's where it gets kind of interesting, because their claim is that the city's argument, which we made before the ordinance was adopted, was pretextual, that in fact we didn't really believe these places could lead to a spread of STDs or created a risk for the transmission of STDs. So that's where Gould and Scherzer come in. They're going to try and convince Judge Silver that the city's argument was pretextual, that in fact these places are not a source for transmission of STDs, and the reason they're not is because swingers, again, assuming that we know what swingers are, swingers are a clean group, basically, and non-swingers aren't. So to the extent that we transmit STDs amongst ourselves, swingers aren't responsible. So Judge Silver asked herself, I suppose, whether or not Gould and Scherzer have something interesting to offer on this topic. And that's where she asked herself the same questions you're asking, under existing law, do Scherzer and Gould meet the standard? And the problem they have is the same problem that Mr. Heddoff failed to address, is that these witnesses may be qualified as experts for something, but they're not qualified as experts on what this plaintiff needs to prove to Judge Silver in the context of the four issues I just gave you. That is their problem. So when Mr. Heddoff says, if it were he to be at the trial court level, he would have hired some preeminent infectious disease expert, it wouldn't do him any good. That doesn't help you in this case. It's not important to any issue before the court whether or not the STDs are transmitted sometimes with a condom, without a condom, what the rate of breakage is, whether you can get genital warts with a condom, whether or not the syphilis is on the rise in Maricopa County, none of this stuff is important. What they needed to convince her of was that the city did not have a legitimate basis in believing that these types of businesses present the risk of the transmission of STDs, and that is not a high hurdle for the city to clear. We cleared it easily. There was nothing Scherzer and Gould could have said that could have illuminated that, even if there is a little bit lower incidence of STDs among swingers. So what? We still have a business that allows swingers, and this is in the record, swingers and non-swingers, assuming swingers are, we have many definitions in the record, but let's assume swingers are married couples that exchange partners while they're married. Those form part of the client base, customer base for these businesses, and then we have other non-swingers there. So even if they were able to show that that narrow subset of their customer base, swingers have a little lower incidence of STDs for whatever reason, what does it matter? What is it relevant to? Issue number four? That's really all that's left, and the city only has to show it has a legitimate basis, a legitimate interest in passing this ordinance. And that's exactly what we did. Now, there are many other things that Judge Silver has going for in this case. As you all know, the trial court is to be granted broad discretion making these decisions. Some of the cases that Mr. Hentoff has cited may fall into a gray area, where had the trial judge ruled the other way, the Ninth Circuit would have had to go along with that, because it's the trial judge that has lived with this case. That was one of the first things I tried to suggest. Judge Silver has lived with this case, has read 500 pages of deposition testimony, heard a number of witnesses in two days of hearing, and if you look at the record, it's very extensive. She has heard counsel on both sides craddle on and on and on. So she had a very good sense of what was left at issue to be decided in this case, and she asked herself, does Scherzer and Gould, given their qualifications, offer anything that's reliable and relevant? And in my brief, I suggested that the two can be viewed separately, but I really think the best way to look at it is, and that's why I took the time to go through these issues issue by issue, is you can only make this reliability decision in the  And that's a particular issue. And so she's asking herself, if Judge – excuse me, if Dr. Scherzer is being offered to explain how STDs are transmitted, he may qualify as an expert. But that's not an issue in this case. What they're trying to show is that the city's claim – Kennedy. The way that Judge Silver talked about relevance, I understand her to be talking about unreliability of methodology having shortcomings, but I didn't perceive her to be talking about relevance. What am I overlooking? You're not, Judge Feller. I was offering that as a suggestion that whenever you're reviewing these reliability questions, you have to be asking yourself, if I make a decision on that, is it going to make any difference to the case? Otherwise, she could have addressed this sort of in a vacuum, as I say, focusing on Dr. Scherzer's qualifications simply to talk about the transmission of STDs, which is not really an issue in this case. He was offering something more specific that may have been relevant. We haven't really gotten to that relevance determination. I don't think the Court will find a discussion of relevancy, so I apologize if I led the Court to believe that. That was me thinking out loud that – trying to imagine how Judge Silver viewed this case. I believe when she was looking at Scherzer's report and Gold's report, she was asking herself. I'm not just going to spend several pages of text analyzing their qualification, whether they're reliable to offer a whole range of opinions that are not relevant to this case. I'm going to focus on those opinions that could conceivably be relevant to one of the four issues left in this case. And I think that's exactly what she did, and she did it consistent with Daubert, Cujo, and Gennaro and the other Ninth Circuit cases. As I read them myself, I became more convinced that it's going to be very difficult, I would think, for a court to look at what she did, the way she went through their testing, their methodology, and conclude that she erred. It was abuse of her discretion. Kennedy. I guess what I'm asking, in essence, is this. If this Court were to conclude that Judge Silver was wrong, which I think is under an abuse of discretion standard, but was wrong in her rulings on the Scherzer or Gould reports, wouldn't it, because the panel were to conclude that, well, there is some minimal methodology that we can identify, would it then be up to this Court to make relevancy determinations? Or wouldn't it be a matter of remanding to Judge Silver to determine whether there was a relevancy problem? Your Honor, I think it would be the latter. I think this Court clearly has the jurisdiction to answer the question whether or not Judge Silver made a mistake when she held that Scherzer and Gould were not reliable. They didn't have the qualifications and the methodology which would suggest that those opinions were reliable enough to qualify as expert witness testimony in Federal Court. That's all she did, as the Court noted. It was me interjecting that relevancy idea. And absolutely, I would reserve the right to argue that if this did go back down and Judge Silver was being told he made a mistake on reliability, these two people are reliable. Again, they need to be reliable in the context of something. Otherwise, we're not really moving the ball very far. So that's why I think the two are kind of related. But she did not discuss relevancy directly. And I believe, speaking for her, that she would like to be able to make that judgment once she had been told by the Court that you erred somehow in your analysis of the expert witness testimony decision. And a couple of final points on that, and I think the Court has already noted this, qualifications alone do not do it. That is the law. You must have a methodology. And we are not talking about the type of expert that had not come up with a methodology. If this is Gin Roe, we're asking what is their discipline, what are their qualifications to express this type of opinion? Do we have an anthropologist, do we have a sociologist, or do we have an unidentified Ph.D.? And not to be terribly unkind to Dr. Scherzer, but if you read his report, it's very difficult to conclude that this is a Ph.D.-quality product. And it leads someone, I think, reading his report to ask some additional questions. What is his Ph.D. in? It's not in the record. We don't know what it's in. What did he base these opinions on? How did he go about forming these opinions? There's no answer to that in the record. And Mr. Gold's testimony suffers all the same problems. We don't know exactly what his discipline is. And one of the things to pick up on what Judge Silver said was if you're an investigative reporter and you're investigating, do you go into a club and tell them, here I am, show me around, and I will then repeat for you in the record how clean your club is and how I don't see an STDs being transmitted, how it looks to me like you're all sharing a core group of beliefs in this sort of thing? No, you don't. So when Judge Silver looked at these two reports and analyzed them in the context of this case, she couldn't find anything in there that would have been reliable enough to allow them to express their opinions in Federal court. And I think her decision was completely in accord with Supreme Court law and the law on the Ninth Circuit. And I'd ask you to rule specifically on that question, whether or not Judge Silver erred in refusing to admit the testimony of Mr. Gold and Dr. Scherzer, and nothing more, because the City was not given notice that anything other than that issue would be on appeal here today. The City having already addressed all of these other issues, ad infinitum, they're in the record. If you're interested, it makes amusing reading, I suppose, but that's not why we're here today. With all due respect, as near as I can tell. Unless there's anything further, I appreciate the opportunity to help you with these issues. Thank you very much. All right. Thank you, Mr. Hayes. Robert. All of Mr. Hayes's concerns go to the weight of the expert reports. They don't go to the admissibility. They are the subject of cross-examination. With respect to notice, I would call the Court's attention to the notice of appeal, which is tab 1, which appeals from both the August 29th order and the August 23rd 1999 order and the 2002 order. I would call the Court's attention to page 4 of the opening brief, which discusses all four issues. I would call the Court's attention to the statement of facts on page 7, which discusses the issues. And finally, I'd call the Court's attention to page 17 of the introduction of the argument, which contains arguments, discussions in case law regarding the privacy and associational interest issue. So the furthest you go is to mention it in the introduction to the argument, but you make no argument about that issue. That's correct. But that doesn't mean that this Court doesn't have jurisdiction over those issues. It's not a matter of jurisdiction. It's a matter of whether we should reach it, because our case law says, you know, if an issue is not argued in the opening brief, you know, it's waived. That's true. And you didn't argue it. As you say, you mentioned it in three places, but there was no argument on it. Yes, Your Honor. I have two more points with the Court's indulgence. Ruling, Judge Silver's ruling was clearly based on admissibility. Gould is relevant to the issue of expression. Scherzer is relevant to the issue of pretextual government, the pretextual context of the alleged governmental interest. If you find expression is present, it's not just a legitimate interest. It's a compelling interest. And finally, I would just ask the Court, the relevancy is addressed in the pleadings. The cases are addressed in the pleadings, not only Taylor, which dealt with the testimony regarding the subculture of prostitution, Mendoza-Payez, which dealt with the subculture of drugs, and, of course, Hankey, which I think is absolutely controllable because of the subculture of gangs. And then we have the Seventh Circuit cases and all the other cases which say that the question ultimately is, is Hankey prevail or does Judge Silver's decision prevail? And for them, for my clients to have their day in court, for the judge to consider the evidence, I believe that you have to find that Hankey prevails. Thank you. Okay. Thank you, Mr. Hantel. Thank you, Mr. Hayes. This case is submitted for decision. Next and last case on today's argument calendar is Aschker v. The California Department of Corrections.
judges: B Fletcher, Tashima, Pollak